Vermont Superior Court
Filed 08/21/24
Orleans Unit

VERMONT SUPERIOR COURT
Orleans Unit
247 Main Street
Newport VT 05855
802-334-3305
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 23-CV-01857

Adam Patten v. Mary Tapogna

## FINDINGS, CONCLUSIONS, AND JUDGMENT

The present matter came before the Court for a bench trial on August 14, 2024. Both Plaintiff Patten's claims and Defendant Tapogna's counterclaims arise from a roofing job that Tapogna hired Patten to perform in the winter of 2023 on her Lyndonville house. Patten seeks payment for $17,700, which represents the outstanding balance on the remainder of the $35,200 that he claims is due and owning on the roofing job that he performed in February and March of 2023. Tapogna has counterclaimed seeking damages for what she alleges is shoddy workmanship and consequential damages.

Based on the findings of the Court and the law of contract governing the parties' relationship, the Court finds that Plaintiff Patten breached the agreement through his failure to properly install the roof, and Defendant Tapogna as the non-breaching party is entitled to damages that will put her in the position that she would have been in if the contract had been fulfilled. Defendant Tapogna is also entitled to damages for Patten's negligence arising from an unsecured ladder falling on Defendant's fence and causing damages to screens and windows. Collectively, Defendant Tapogna is entitled to damages in the amount of $11,921.39. All other claims and requests for damages in the matter are denied as a matter of fact and law.

### Findings of Fact

On July 5, 2022, Plaintiff Adam Patten delivered an estimate to Defendant Mary Tapogna that outlined a proposed scope of work. Patten, working under the business name A.C.T. Roofing, would replace Tapogna's asphalt shingle roof with a corrugated metal roof. The estimate had one single cost item for the expected roof demolition and replacement of $33,600 and a second cost for the roll off dumpster that would have to be rented of $1,600. In the notes, Patten indicated that he would be taking the roof down to the decking and removing all shingles, underlayment, and drip edges. He indicated that he would

inspect the decking for rot. He indicated that decking replacement, if necessary, would be an extra charge. He also stated that he would put a synthetic layer on the entire roof and install new drip edges.

Tapogna agreed to this scope of work and hired Patten to perform the work. Nothing in the estimate indicates that Patten would not perform work on certain areas, and the estimate is silent on flashing or counterflashing. It also does not make reference to a widow's walk section of the roof. Patten admits that he did not climb onto the roof at the time that he generated the estimate and that his scope of work was based solely on his visual observations from the ground. The parties did not reduce their agreement to a written contract. The estimate itself does not include space for Tapogna to accept the estimate or any language indicating that parties intended to be bound by any further specific terms or conditions beyond the estimate. Based on the evidence and testimony of the parties, the Court finds that the estimate loosely describes the scope of work that Patten was offering to perform and the price that he was offering. This price is consistent with the amount that Patten seeks in this litigation minus the initial payment made by Tapogna at the start of Patten's work.

In February of 2023, Patten began work at Tapogna's Lyndonville house. Tapogna paid Patten an initial deposit of $17,500, which was 50% of the amount agreed upon for the work. Patten removed and took off all the existing asphalt shingles and disposed of them in a roll off dumpster that was delivered to the site and removed at the end of the project. Patten then installed corrugated metal roof on the house. Patten did not replace any of the subroof's decking board but simply laid the synthetic material over the existing decking and screwed the metal into the existing decking. Patten put the corrugated panels on the entire roof, except for a porch, which he claims Tapogna did not want him to finish, and on the widow's walk at the top of the house, which would require a rubber roof due to its shape and location. Patten claims that he informed Tapogna that he did not install rubber roofs and that she would have to find a separate contractor to deal with this section. Tapogna states that this was not her understanding. The Court finds Patten's testimony credible, but it also finds that the original estimate and scope of work did not include provisions to install a rubber roof, and even if Patten would have installed it, it would have been a change to the contract and required additional consideration as it went beyond the parties' agreed upon scope.

In March of 2023, Patten had largely completed his work and had removed his equipment and tools. While Patten claims there were a few follow-up items to complete, he agreed that his work was done. Around this time, Tapogna informed him of her dissatisfaction, and she informed him that he was not allowed back onto the property. Shortly thereafter, she hired John Calamaio to do an inspection of the property. Calamaio did the inspection and produced a report detailing his findings. While Calamaio is not

a roofer or contractor, he is a licensed property inspector, and his report is derived from his actual observations and training. The Court finds the report to be credible and accurate in detailing the issues with the roof that Tapogna has incorporated into her answer and counterclaims.

Tapogna also hired Bob Barnes, a concrete contractor to inspect the roof. His findings mirrored Calamaio's, but he did not produce a report or do work on the property.

After Calamaio's and Barnes' inspections, Tapogna contracted with Justin Ouellette, doing business as North Ridge Renovations. Ouellette conducted a more extensive review of the roof. His findings and observations are consistent with Calamaio's and Barnes'. Tapogna contracted with Ouellette to have him repair the roof, but Ouellette came to the conclusion that the entire roof needed to be removed as it needed a base of plywood underneath to support any roofing structure and to address the dimpling and unanchored screws that he found on the Patten-installed roofing panels.

Ouellette performed this work in early 2024. The total for this work came to $57,500, and it included removal of the old roof ($6,500), installation of plywood on all surfaces of the sub-roof repair ($15,000), purchase and installation of a new roof ($27,500), replacement of flashing around chimneys and brick work ($5,500), and installation of a rubber roof on the widow's walk area ($3,000). Following Ouellette's work, the leaking issue ceased at Tapogna's house, and Tapogna reports that she is satisfied with the new roof.

Based on the testimony of Defendant's experts and as shown in the photographic exhibits, there were several issues with Patten's installation.

First, the existing decking was insufficient to support the metal panels. The decking, originally installed in the 19th century had gaps and missing segments that left a number of screws, used to secure the metal panels, unanchored. The evidence indicates that Patten attempted to fix this issue with caulking, but both Justin Ouellette and John Calamaio, who examined Patten's work, credibly opined that it was insufficient, that many screws lifted out at the slightest tug, and they would eventually give way leading to leaking and failure on these roof panels. The witnesses testified that these problems were not a matter of if but when.

Second, both Calamaio and Ouellette credibly testified that several of the screws were sunk too low. This caused the metal panels to dimple around the screw, which would likely cause water to pool around the screw and would affect the integrity of the roof over the long-term and were likely to cause leaking in the short-term.

Third, Calamaio and Ouellette noted that the flashing was loose or improperly installed in several locations that would, over the long term, cause water to infiltrate the house and cause both leaking and water damage. Ouellette also admitted the flashing on this house was more complicated and involved because of the extensive brickwork and deteriorated state of the existing lead flashing. Ouellette stated that he ended up covering certain costs overruns in this portion of the work.

Fourth, it is undisputed that Patten did not do any work on the widow's walk at the top of the house, and it is undisputed that after his work, leaking from this area continued and may have increased.

Fifth, Calamaio's report indicates that Patten did not complete the roofing job as many of the panels were missing gaskets at the end of the panels that prevent wind from driving rain and snow up and under the roof. Calamaio also found that much of the drip edge was roughly installed, loose, and already falling off the house.

Sixth, Tapogna presented extensive evidence of areas where the trim work around the house cracked or came loose during Patten's work. The evidence and testimony shows that Patten left this trim with substantial cracks and splits, which Patten did not address or cure before leaving the site.

Seventh, all of the experts presented by Tapogna independently opined that Patten's work was done quickly and roughly, that it did not include the type of finishing work that would be necessary to secure and water-proof the roof. The conclusions of these experts, which the Court accepts, is that the roof was improperly installed in areas and incomplete in others, and that if it had been left in place, it would have let to water infiltration, rot, and eventual failure.

Patten's defense to much of this is to disclaim responsibility for certain areas. Patten claims that he did not contract to replace the sub-roof. He testified that he expressly disclaimed any responsibility for the widow's walk area because he does not install rubber roofs. He also stated that he was not a mason and could not install the flashing against the building's brickwork.[1]

In her counterclaims, Tapogna seeks the difference in cost between Patten's roof costs and the costs of Ouellette's replacement. Tapogna also seeks the costs of painting and repairs to the trim work in the amount of $10,900.

---

[1] Tapogna' house is a brick italianate-style house with gable and hip roof lines. In addition to the main house's primary roof, the house has at least two porches that attach to the brick as well as a wooden garage that is attached to the rear of the house. As a result, there multiple areas on the house where a roofline meets or runs along brick work. These areas necessitate that any roof installation would have to include proper flashing and counter flashing to ensure a secure seal between the brick surface and the adjoining roof.

In addition to these primary damages, Tapogna also testified that Patten left an unsecured ladder against the house, which fell, causing damage to both Tapogna's house and screens in the amount of $921.39. Tapogna seeks compensation for this negligence and the resulting damages.

## Legal Analysis

The primary nature of Patten and Tapogna's relationship was contractual. The undisputed evidence is that the two parties agreed to have Patten remove Tapogna's old and failing roof and replace it with a new metal roof. The parties agreed that Tapogna would pay Patten $35,200 for this work. To date, Tapogna has only paid half of the amount. While the parties never reduced their agreement to writing, there is evidence of sufficient mutual assent on all of the essential particulars to deem the parties' agreement to be contractual and enforceable in nature. *Evarts v. Forte*, 135 Vt. 306, 309 (1977).

The difficulty in this case and the essence of the divide between Patten and Tapogna lies with the nature of the agreement. Patten seeks to characterize his role almost akin to a subcontractor. He was hired to remove the old roof, and he was hired to install the new roof. Nothing more, nothing less. Any issues with flashing, the widow's walk, or trim were outside the scope of his work, and therefore outside of his responsibility.

This position, however, belies the language of Patten's estimate as well as the nature and context of the parties' agreement. *Isbrandtsen v. North Branch Corp.*, 150 Vt. 575, 578 (1988) (courts must look to the context and circumstances of the parties' agreement to determine meaning and ambiguity).

In this case, Patten was the one and only roofing contractor that Tapogna hired at the time. He was not acting as the sub-contractor, and there was no general contractor. There were no express disclaimers or language in the estimate or the parties' communications that expressly limited the scope of Patten's work. Nothing from the agreements or from the credible testimony about events leading up to the start of Patten's work indicated that he would not be doing certain parts of the roofing job. Further, there is no evidence that Patten asked about other contractors or indicated to Tapogna after the work began that he had found issues that would require another contractor and that fell beyond the scope of his work.

It was not unreasonable for Tapogna to expect that Patten would either complete the roofing work necessary to make her roof waterproof or would communicate what needed to be done to complete the work, and then either hire subcontractors, as Ouellette did, or make clear to Tapogna that she would need to hire separate contractors to complete the portions of the job that remained undone. The latter would

have also included an explanation or communication as to why they exceeded the scope of Patten's contract. Neither of these things happened.

The evidence also shows that Patten did not inspect the decking in a careful and reasonable manner. If he had, he would have seen that the decking was not sufficient to anchor the panels at each point. This failure is particularly important because it led directly to the subsequent need by Ouellette to remove the panels to perform these repairs.

For these reasons, the Court finds that Patten's actions were inconsistent with the terms of the parties' agreement. The Court also finds that Patten did not complete the work that was expected of him under the agreement, and what work he did complete was not done in an entirely workman-like manner consistent with the parties' expectations under the agreement. Specifically, the roof, as installed, was not installed correctly, and its defects promised future leaks.

Based on this, the Court finds that Patten is the breaching party, and Tapogna is the non-breaching party under the agreement. As such, Tapogna is excused from performing under the agreement is not obligated to pay the remainder of the consideration originally agreed upon by the parties. Tapogna is further entitled to damages caused by Patten's breach. Under Vermont law, the measure of any damages for a non-breaching party is to take the loss in the value of what non-breaching party suffered as a direct result of the breach, plus any consequential damages, and minus any cost or loss that the non-breaching party has avoided by not having to pay. *Foti Fuels, Inc. v. Kurrle Corp.*, 2013 VT 111, ¶32 (quoting *McGee Construction Co. v. Neshobe Dev. Inc.*, 156 Vt. 550, 557 (1991); and RESTATEMENT (SECOND) OF CONTRACTS § 347).

In other words, the measure of damages for a non-breaching party should put them where they were expected to be at the end of the agreement. It is not an opportunity for the non-breaching party to be enriched. *Tour Costa Rica v. Country Walkers, Inc.*, 171 Vt. 116, 124 (2000).

In this case, it is important to frame what the Patten contract would and would not have included if he had not breached the agreement. The contract did not and would not have included the cost of the flashing along the brick work, the cost of plywood along the decking, or the cost of re-roofing the widow's walk. These expenses would have been performed at an additional cost.

The contract also would not have included the architectural shingles that Ouellette elected to use. Instead, it would have involved corrugated metal panels anchored by insulated screws that Patten purchased and which remain at Tapogna's property. There was no evidence indicating either why Ouellette switched roofing materials or why they did not put the existing metal panels back on the roof at

the conclusions. There is also no evidence to suggest that the metal panels are without value or that the decision to switch materials was done for any purpose related to Patten's breach.

With these considerations in mind and looking strictly at the costs involved, the Court finds that Tapogna incurred the following expenses as a direct result of Patten's breach: 1) $6,500 to remove the metal roof and install plywood; and 2) $27,500 installation of new shingles. Against these damages, Patten is entitled to a credit of $17,700 that Tapogna did not incur as a result of the breach but would have had to pay if the contract had not been breached. This reduces Tapogna's damages to $16,300. Against these damages, however, the Court finds that Patten is entitled to a further credit of $5,300 reflecting the materials that Patten purchased and provided to Tapogna and that Tapogna has kept and retained on her property. The Court arrives at this number by looking to Patten's original estimate and taking approximately 15% of that amount as a baseline for the cost of materials.[2] This would reduce the total amount of damages to **$11,000**.

The remainder of Tapogna' expenses for plywood, the widow's walk, and flashing were expenses that she would have had to incur even if Patten has performed under the terms of his contract because they exceed the scope of the work that he was doing. In other words, even if Patten had performed all of the terms of his contract, the plywood, flashing, and rubber roof would have been additional charges either through subcontractors engaged through Patten or obtained directly by Tapogna. The fact that she has incurred these expenses under a subsequent contractor does not constitute either a restitution or consequential damage, and they are not allowed.

Similarly, the house painting estimate is not allowed. There was no evidence that the damage to the trim was the result of improper installation. As trim sitting at the edge of a roof that is being removed, it is not unreasonable to conclude that these pieces would come loose in the process and would have to be repaired and re-painted. Tapogna's painting estimate goes to this damage, and it is not awarded.

Finally, the Court will allow the damages resulting from Patten's unsecured ladder. Patten presented no evidence that would contradict the testimony that the ladder was left leaning against the house and was unsecured. The Court awards Tapogna **$921.39** for Patten's negligence and the resulting damage to the fence and screens.

---

[2] To the extent that the original purchase may have been higher, the Court is comfortable awarding the lower amount given that the metal panels may have a limited value. To the extent that the value assigned may exceed the value of the panels in a re-sale situation, the Court is also comfortable as it received no evidence showing why the panels could not be salvaged and re-installed. As such, the Court cannot determine that the panels were a total loss to Tapogna, and this modification is intended to take this ambiguous value into account as a partial benefit rendered to Tapogna

## **<u>ORDER</u>**

Based on the foregoing, the Court awards judgment in this matter to Defendant Mary Tapogna against Plaintiff Adam Patten in the amount of **$11,921.39**. Defendant is also entitled to reasonable court costs under V.R.C.P. 54. Defendant Tapogna's counsel shall prepare a final judgment in this matter, which the Court shall review and adopt.

Electronically signed on 8/17/2024 3:00 AM pursuant to V.R.E.F. 9(d)

_____

Daniel Richardson
Superior Court Judge